## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ELIZABETH RUSSETT, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NTVB MEDIA INC.,<br><br>Defendant. | Case No. 22-cv-10352<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Elizabeth Russett ("Plaintiff"), individually and on behalf of herself and all others similarly situated, by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

### INTRODUCTION

1.      Defendant NTVB Media Inc. ("NTVB") rented, exchanged, and/or otherwise disclosed personal information about Plaintiff's *TV Guide* magazine subscription, from within the State of Michigan, to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed her information to aggressive advertisers, political organizations, and non-profit companies.  As a result, Plaintiff has received a barrage of unwanted junk mail.  By

renting, exchanging, and/or otherwise disclosing Plaintiff's Personal Reading Information (defined below) during the relevant pre-July 30, 2016 time period[1], NTVB violated Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "PPPA").[2]

2.      NTVB also sold, rented, and/or otherwise disclosed, from within the State of Michigan, the Personal Reading Information of its other subscribers to *TV Guide* magazine and NTVB's other publications during the relevant pre-July 30, 2016 time period, also in violation of the PPPA.

3.      Documented evidence confirms these facts.  For example, a list broker, NextMark, Inc. ("NextMark"), offers to provide renters access to the mailing list titled "TV Guide Magazine Enhanced Subscribers Mailing List", which contains the

---

[1]      The statutory period for this action is six years. *See* M.C.L. § 600.5813.

[2]      In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq.*). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case.  *See Horton v. GameStop, Corp.*, 380 F. Supp. 3d 679, 683 (W.D. Mich. 2018).

Personal Reading Information of 858,468 of NTVB's active U.S. subscribers at a base price of "$110.00/M [per thousand]," (*i.e.*, 11 cents apiece), as shown in the screenshot below:



*See* **Exhibit A** hereto.

4.     By renting, exchanging, or otherwise disclosing the Personal Reading Information of its Michigan-based subscribers during the relevant pre-July 30, 2016 time period, from its headquarters within the State of Michigan, NTVB violated the

PPPA.  Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials ... shall not disclose to any person, other than the customer, a record or information concerning the purchase ... of those materials by a customer that indicates the identity of the customer.

PPPA § 2.

5.      Accordingly, Plaintiff brings this Class Action Complaint against NTVB for its intentional and unlawful disclosure of its customers' Personal Reading Information in violation of the PPPA.

## NATURE OF THE CASE

6.      To supplement its revenues, NTVB rents, exchanges, or otherwise discloses its customers' personal information—including their full names, titles of publications subscribed to, and home addresses (collectively "Personal Reading Information"), as well as myriad other personal and demographic information such as age, gender, and income—to data aggregators, data appenders, data cooperatives, and other third parties without the written consent of its customers.

7.      By renting, exchanging, or otherwise disclosing – rather than selling – its customers' Personal Reading Information, NTVB is able to disclose the information time and time again to countless third parties.

8.      NTVB's disclosure of Personal Reading Information and other

personal information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.

9.      While NTVB profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Personal Reading Information and other personal information in Michigan, it does so at the expense of its customers' privacy and statutory rights because NTVB discloses this information from within Michigan and does not obtain its customers' written consent prior to disclosing their Personal Reading Information.

## PARTIES

10.     Plaintiff Elizabeth Russett is a natural person and citizen of the State of New York.  Plaintiff was a subscriber to *TV Guide* magazine, including during the relevant pre-July 30, 2016 time period.  *TV Guide* magazine is published by NTVB. Plaintiff purchased her subscriptions to *TV Guide* magazine directly from NTVB, by sending NTVB money to its headquarters in Troy, Michigan.  NTVB collected the money paid to it by Plaintiff for her *TV Guide* subscriptions in Michigan.  Prior to and at the time Plaintiff subscribed to *TV Guide*, NTVB did not notify Plaintiff that it discloses the Personal Reading Information of its customers, and Plaintiff has never authorized NTVB to do so.  Furthermore, Plaintiff was never provided any written notice that NTVB rents, exchanges, or otherwise discloses its customers' Personal Reading Information, or any means of opting out.  Since subscribing to *TV*

*Guide*, and during the relevant pre-July 30, 2016 time period, NTVB disclosed, from within the State of Michigan, Plaintiff's Personal Reading Information to data aggregators, data appenders, and/or data cooperatives (who then supplemented that information with data from their own files) – without obtaining consent from or even providing prior notice to Plaintiff.  At all times after Plaintiff became a *TV Guide* subscriber but prior to NTVB's disclosure of Plaintiff's Personal Reading Information during the relevant pre-July 30, 2016 time period, NTVB was headquartered in Michigan, maintained its principal place of business in Michigan, and was a citizen of Michigan, and was therefore in Michigan at the time it was required to, but did not, notify Plaintiff that it would disclose her Personal Reading Information.  Likewise, at all times after Plaintiff became a *TV Guide* subscriber but prior to NTVB's disclosure of Plaintiff's Personal Reading Information during the relevant pre-July 30, 2016 time period, NTVB was headquartered in Michigan, maintained its principal place of business in Michigan, and was a citizen of Michigan, and was therefore physically present in Michigan at the time it was required to, but did not, obtain Plaintiff's consent in Michigan prior to disclosing her Personal Reading Information from its headquarters in Michigan.  Moreover, during the relevant pre-July 30, 2016 time period, and also from its headquarters in Michigan, NTVB rented or exchanged mailing lists containing Plaintiff's Personal Reading Information to third parties seeking to contact NTVB's subscribers, without

6

first obtaining Plaintiff's written consent or even giving her prior notice of these rentals, exchanges, and/or other disclosures – informed consent which NTVB was likewise required to obtain from Plaintiff while NTVB was headquartered in Michigan, a citizen of Michigan, and physically present in Michigan (and which would have been received by NTVB at its corporate headquarters in Troy, Michigan assuming it had been requested by NTVB and provided by Plaintiff).  Because NTVB rented, exchanged, and/or otherwise disclosed Plaintiff's Personal Reading Information, Plaintiff has received junk mail from various organizations that do not offer products or services to consumers.  NTVB disclosed Plaintiff's Personal Reading Information to these organizations from its headquarters within Michigan. These unwarranted mailings waste Plaintiff's time, money, and resources.  These harassing junk mailings received by Plaintiff are attributable to NTVB's unauthorized rental, exchange, and/or disclosure of her Personal Reading Information from within Michigan, and its failure to seek much less obtain Plaintiff's informed written consent to such disclosures at a time when it was headquartered in Michigan, a citizen of Michigan, and physically present in Michigan.  Because Plaintiff is entitled by law to privacy in her Personal Reading Information, and because she paid money for her subscription – money which she sent to, and which NTVB collected at, NTVB's headquarters in Michigan – NTVB's disclosure of her Personal Reading Information deprived Plaintiff of the full set of benefits to which

she was entitled as a part of her *TV Guide* subscription, thereby causing her economic harm.   NTVB has unjustly retained the money Plaintiff paid for her *TV Guide* subscription in Michigan, and Plaintiff is informed and believes that such money has been deposited by NTVB into a bank account held at a financial institution located in Michigan.   Accordingly, what Plaintiff received (a subscription without statutory privacy protections) was less valuable than what she paid for (a subscription with accompanying statutory privacy protections), and she would not have been willing to pay as much, if at all, for her *TV Guide* subscription had she known that NTVB would disclose her Personal Reading Information.

11.   Defendant NTVB Media Inc. is a Michigan corporation with its headquarters and principal place of business in Troy, Michigan.   NTVB does business throughout the United States. NTVB is the publisher of several nationally circulated magazines, including *Puzzler*, *Channel Guide*, *OnDISH*, *ReMIND*, *TV Weekly*, and *VIEW!*, as well as its flagship publication *TV Guide* magazine.

## JURISDICTION AND VENUE

12.   This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

13.     Personal jurisdiction and venue are proper because NTVB because NTVB maintains its corporate headquarters and principal place of business in Troy, Michigan and within this District.

## FACTUAL BACKGROUND

### *Michigan's Preservation of Personal Privacy Act*

14.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

15.     Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the PPPA "to preserve personal privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information.  H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

16.     Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record

9

> or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2 (emphasis added).

17.     Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection.  This intimate process should be protected from the disruptive intrusion of a roving eye."  S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

18.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes.  And it protects the selection of books that we choose to read."  134 Cong. Rec. S5399 (May 10, 1988).

19.     Senator Leahy also explained why choices in movies and reading materials are so private: "These activities are at the core of any definition of personhood.  They reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people."  *Id.*

20.     Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit B**).

21.     Despite the fact that NTVB maintains its corporate headquarters and principal place of business in Michigan, and is thus a citizen of the State of Michigan, NTVB has disregarded its legal responsibilities under the PPPA by systematically selling, renting, and otherwise disclosing all of its subscribers' Personal Reading Information from within the State of Michigan.

### The Personal Information Market: Consumers' Personal Information Has Real Value

22.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[3]

---

[3]     The Information Marketplace:  Merging and Exchanging Consumer Data (Mar.      13,       2001),      at       8:15-11:16,       *available       at* https://www.ftc.gov/sites/default/files/documents/public_events/information-

23.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[4]

24.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[5]

25.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive"

---

marketplace-merging-and-exchanging-consumer-data/transcript.pdf   (last   visited May 29, 2021).

[4]     *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274 .html (last visited May 29, 2021).

[5]     Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009),           at           2,           *available*           *at* https://www.ftc.gov/sites/default/files/documents/public_statements/remark s-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited May 29, 2021) (emphasis added).

information in an open and largely unregulated market.[6]

26.    The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[7]

27.    Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[8]

28.    Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive

---

[6]    *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited May 29, 2021).

[7]    Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of- consumer-database-marketing.html (last visited May 29, 2021).

[8]    Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited May 29, 2021).

13

collections of consumer data.[9]

29.     In their letter, the co-Chairmen recognized that:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer.  This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[10]

30.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[11] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like NTVB share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within

---

[9]     *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited May 29, 2021).

[10]     *Id.*

[11]     *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited May 29, 2021).

the reach of fraudulent telemarketers" and other criminals.[12]

31.     Information disclosures like those made by NTVB are particularly dangerous to the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[13]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[14]

32.     Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.  Thus, information disclosures like NTVB's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[15]

---

[12]    Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html (last visited May 29, 2021).

[13]    *Id.*

[14]    *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited May 29, 2021).

[15]    *See id.*

33.     NTVB is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

34.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases

35.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their personal information.

36.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[16]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[17]

---

[16]     *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited May 29, 2021).

[17]     *Id.*

37.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

38.     In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[18]

39.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace:   consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[19]

---

[18]     *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited May 29, 2021).

[19]     *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited May 29, 2021).

40.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[20]  As such, while a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### NTVB *Unlawfully Rents, Exchanges, And Discloses Its Customers' Personal Reading Information*

41.     NTVB maintains a vast digital database comprised of its customers' Personal Reading Information.  NTVB discloses its customers' Personal Reading Information, from its headquarters in Troy, Michigan, to data aggregators and appenders, who then supplement that information with additional sensitive personal information about each NTVB customer, including his or her age, gender, and income.  (*See, e.g.*, **Exhibit A**).

42.     NTVB then rents and/or exchanges, also from its corporate headquarters in Troy, Michigan,  mailing lists for its various publications—which include subscribers' Personal Reading Information identifying which individuals purchased subscriptions to particular magazines, and can include the sensitive

---

[20]     *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited May 29, 2021) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibit A**).

43.     NTVB also discloses its customers' Personal Reading Information, again from its corporate headquarters in Troy, Michigan, to data cooperatives, who in turn give NTVB access to their own mailing list databases, which NTVB receives and then accesses in Michigan.

44.     As a result of NTVB's data compiling and sharing practices – all of which occurs in the State of Michigan – companies can purchase and/or obtain mailing lists from NTVB that identify NTVB's customers by their most intimate details, such as their age, gender, and income.  NTVB's disclosures of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

45.     NTVB does not seek its customers' prior consent, written or otherwise, to any of these disclosures and its customers remain unaware that their Personal Reading Information and other sensitive personal information is being rented and exchanged on the open market.

46.     At all times prior to disclosing its customers' Personal Reading Information, including during the relevant pre-July 30, 2016 time period, NTVB

was headquartered in Michigan with its principal place of business in Michigan, and was physically present in Michigan at the time it was required to, but did not, obtain its customers' informed consent prior to disclosing all of their Personal Reading Information from its headquarters in Michigan.  Moreover, during the relevant pre-July 30, 2016 time period, and also from its headquarters in Michigan, NTVB rented or exchanged mailing lists containing all of its customers' Personal Reading Information to third parties seeking to contact NTVB's subscribers, without first obtaining any of its customers' written consent or even giving them prior notice of these rentals, exchanges, and/or other disclosures – informed consent which NTVB was likewise required to obtain from its customers while NTVB was headquartered within, a citizen of, and physically present in Michigan (and which would have been received by NTVB at its corporate headquarters in Troy, Michigan had it been requested by NTVB and provided by Plaintiff).

47.     Consumers can sign up for subscriptions to NTVB's publications through numerous media outlets, including the Internet, telephone, or traditional mail, and by remitting payment to NTVB which is thereafter received by NTVB in Michigan.  Regardless of how the consumer subscribes, NTVB never requires the individual to read or affirmatively agree to any terms of service, privacy policy, or information-sharing policy.  Consequently, NTVB uniformly fails to obtain any form of consent from – or even provide effective notice to – its customers before

20

disclosing their Personal Reading Information from within Michigan.

48.     As a result, NTVB disclosed, from within Michigan, its customers'
Personal Reading Information – including their reading habits and preferences that
can "reveal intimate facts about our lives, from our political and religious beliefs to
our health concerns"[21] – to anybody willing to pay for it.

49.     By and through these actions, NTVB has intentionally disclosed, from
within Michigan, its Michigan customers' Personal Reading Information to third
parties, without the requisite consent of its customers, in direct violation of the
PPPA.

## CLASS ACTION ALLEGATIONS

50.     Plaintiff seeks to represent a class defined as all individuals in the
United States who, at any point during the relevant pre-July 30, 2016 time period,
had their Personal Reading Information disclosed to third parties by NTVB without
consent (the "Class").  Excluded from the Class is any entity in which Defendant has
a controlling interest and officers or directors of Defendant, as well as any individual
residing in Michigan whose Personal Reading Information was only disclosed to a
third party by NTVB on or before October 25, 2015 (but only insofar as any such
individual's claim was released in connection with the class-action settlement in the

---

[21]     *California's Reader Privacy Act Signed into Law*, Electronic Frontier
Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last
visited May 29, 2021).

action *Higgins v. TV Guide Magazine LLC*, Case No. 2:15-cv-13769-SJM-MKM
(E.D. Mich.)).

51.     Members of the Class are so numerous that their individual joinder
herein is impracticable.  On information and belief, members of the Class number in
the thousands.  The precise number of Class members and their identities are
unknown to Plaintiff at this time but may be determined through discovery.  Class
members may be notified of the pendency of this action by mail and/or publication
through the distribution records of Defendant.

52.     Common questions of law and fact exist as to all Class members and
predominate over questions affecting only individual Class members.  Common
legal and factual questions include, but are not limited to: (a) whether NTVB is a
"retailer or distributor" of publications (*i.e.*, magazines); (b) whether NTVB
obtained consent before disclosing to third parties Plaintiff's and the Class's
Personal Reading Information; and (c) whether NTVB's disclosure of Plaintiff's and
the Class's Personal Reading Information violated the PPPA in Michigan.

53.     The claims of the named Plaintiff are typical of the claims of the Class
in that the named Plaintiff and the Class sustained damages as a result of Defendant's
uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the
Class's Personal Reading Information.

54.     Plaintiff is an adequate representative of the Class because her interests

do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

55.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSE OF ACTION
**Violation of Michigan's Preservation of Personal Privacy Act
(PPPA § 2)**

56.    Plaintiff repeats the allegations contained in the foregoing paragraphs

as if fully set forth herein.

57.     Plaintiff brings this claim individually and on behalf of members of the Class against Defendant NTVB.

58.     NTVB oversees the publishing of *TV Guide* and its magazines and other publications from within Michigan.

59.     NTVB oversees the sale of subscriptions to *TV Guide* and its magazines and other publications from within Michigan.

60.     NTVB collects the money that its customers pay for subscriptions to *TV Guide* and its magazines and other publications within Michigan.

61.     Plaintiff is informed and believes, and thereupon alleges, that NTVB collects in Michigan and thereafter deposits in Michigan the money that it receives from its customers (including *TV Guide* subscribers and subscribers to its other publications) into bank accounts held at financial institutions in Michigan.

62.     NTVB sends to customers their issues of *TV Guide* magazine and its other magazines and publications from Michigan, and/or oversees such mailings pertaining to all of its publications from within Michigan.

63.     NTVB interacts and communications with its customers from its corporate headquarters in Michigan. NTVB has been a citizen of Michigan, headquartered in Michigan, and physically present in Michigan at all times relevant to this action, including prior to disclosing and at the time it disclosed all of its

customers' Personal Reading Information from within Michigan.  Accordingly, prior to disclosing its customers' Personal Reading Information from within Michigan, NTVB could have, from and while present in Michigan, provided notice to its customers to inform its customers that it would be disclosing their Personal Reading Information, but it failed to do so.  Likewise, prior to disclosing its customers' Personal Reading Information from within Michigan, NTVB could have, from and while present in Michigan, obtained its customers consent to its disclosures of their Personal Reading Information from within Michigan.

64.    As a publisher that sells subscriptions to magazines and other publications to consumers, NTVB is engaged in the business of selling written materials at retail from within Michigan.  *See* PPPA § 2.

65.    By purchasing a subscription to *TV Guide* magazine, Plaintiff purchased written materials directly from NTVB.  *See* PPPA § 2.

66.    Because Plaintiff purchased written materials directly from NTVB, she is a "customer" within the meaning of the PPPA.  *See* PPPA § 1.

67.    At various times during the relevant pre-July 30, 2016 time period, NTVB disclosed Plaintiff's Personal Reading Information, which identified her as a *TV Guide* magazine subscriber and customer, in at least three ways, all from its corporate headquarters within Michigan.

68.    First, NTVB disclosed, from within Michigan, mailing lists containing

25

Plaintiff's Personal Reading Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to NTVB in Michigan, which NTVB received in Michigan.

69.    Second, NTVB disclosed, from within Michigan, mailing lists containing Plaintiff's Personal Reading Information to data cooperatives, who in turn gave NTVB access to their own mailing list databases, which NTVB accessed in Michigan.

70.    Third, NTVB rented and/or exchanged, from within Michigan, its mailing lists containing Plaintiff's Personal Reading Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, and volunteer work, including without limitation Nextmark.

71.    All of the money that NTVB received from the third parties to whom it disclosed Plaintiff's Personal Reading Information was sent to NTVB's headquarters in Michigan and was received by NTVB at its headquarters in Michigan.

72.    Because the mailing lists NTVB disclosed from within Michigan included additional personal and demographic information from data aggregators

and appenders, the lists were more valuable, and NTVB was able to increase its profits gained from the mailing list rentals and/or exchanges, profits NTVB received in Michigan.

73.    By renting, exchanging, or otherwise disclosing its customer lists, during the relevant pre-July 30, 2016 time period, from within Michigan, NTVB disclosed to persons other than Plaintiff, from within Michigan, records or information concerning her purchase of written materials from NTVB.  *See* PPPA § 2.  All of NTVB's records concerning Plaintiff's purchase of written materials that were disclosed by NTVB were, prior to their disclosure, stored by and accessible to NTVB in its headquarters in Michigan. Accordingly, NTVB's disclosures of Plaintiff's Personal Reading Information originated from within Michigan.

74.    The information NTVB disclosed from its headquarters in Michigan indicated Plaintiff's name and address, as well as the fact that she subscribed *TV Guide*.  Accordingly, the records or information disclosed by NTVB from within Michigan indicated Plaintiff's identity.  *See* PPPA § 2.

75.    Plaintiff and the members of the Class never consented to NTVB disclosing their Personal Reading Information to anyone.

76.    Worse yet, Plaintiff and the members of the Class did not receive notice before NTVB disclosed their Personal Reading Information to third parties.

77.    NTVB's disclosures of Plaintiff's and the Class's Personal Reading

Information during the relevant pre-July 30, 2016 time period were not made pursuant to a court order, search warrant, or grand jury subpoena.

78.   NTVB's disclosures of Plaintiff's and the Class's Personal Reading Information during the relevant pre-July 30, 2016 time period were not made to collect payment for their subscriptions.

79.   NTVB's disclosures of Plaintiff's Personal Reading Information during the relevant pre-July 30, 2016 time period originated from within Michigan and were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, and volunteer work—all in order to increase NTVB's revenue and profit, which is subject to taxation by the State of Michigan.  Accordingly, NTVB's disclosures of its customers' Personal Reading Information in Michigan were not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Class.

80.   By disclosing Plaintiff's Personal Reading Information during the relevant pre-July 30, 2016 time period from within Michigan, while it was headquartered in and a citizen of Michigan, NTVB invaded Plaintiff's and the Class's statutorily-protected right to privacy in their reading habits in violation of the PPPA from within Michigan.  *See* PPPA § 2.

81.   Additionally, because Plaintiff and the members of the Class paid for their subscriptions to NTVB's publications by remitting payments to NTVB that

were received by NTVB in Michigan, and because NTVB was obligated to comply with the PPPA in Michigan, NTVB's unlawful disclosures of Plaintiff's and the other Class members' Personal Reading Information from within Michigan deprived Plaintiff and the Class members of the full value of their paid-for subscriptions. Because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, NTVB's unlawful rental, exchange, and/or other disclosure of their Personal Reading Information from within Michigan, coupled with NTVB's retention in Michigan of the money that Plaintiff and the Class paid for their subscriptions, caused Plaintiff and the unnamed members of the Class to receive less value than they paid for, thereby causing them economic harm.

82. Likewise, because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, a magazine publication subscription that keeps their Personal Reading Information private is more valuable than one that does not.

83. Accordingly, had Plaintiff been adequately informed of NTVB's disclosure practices from within Michigan – information which NTVB could and should have provided to Plaintiff from within Michigan – Plaintiff would not have been willing to purchase her *TV Guide* subscription at the price charged, if at all, and thus would not have remitted payment for such subscription to NTVB's headquarters in Michigan. Thus, NTVB's unlawful disclosures from within Michigan and its

unlawful retention of Plaintiff's money in Michigan caused Plaintiff economic harm.

84.     NTVB's disclosure of Plaintiff's Personal Reading Information to third parties from within Michigan has also caused an influx of third-party print advertisements.

85.     As a result of NTVB's unlawful disclosures of their Personal Reading Information from within Michigan during the relevant pre-July 30, 2016 time period, Plaintiff and the members of the Class have suffered privacy and economic injuries. On behalf of herself and the Class, Plaintiff seeks: (1) $5,000.00 per Class member pursuant to PPPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to PPPA § 5(b).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.     For an order declaring that Defendant's conduct as described herein violates the Preservation of Personal Privacy Act, PPPA;

C.     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.     For an award of $5,000 to Plaintiff and each Class member, as provided by the Preservation of Personal Privacy Act,

PPPA § 5(a);

E.    For prejudgment interest on all amounts awarded; and

F.    For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: February 17, 2022            Respectfully submitted,

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248-841-2200
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

Philip L. Fraietta (P85228)
pfraietta@bursor.com
Joseph I. Marchese
jmarchese@bursor.com
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163

Frank S. Hedin
fhedin@hedinhall.com
Arun G. Ravindran
aravindran@hedinhall.com
HEDIN HALL LLP

31

1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
Fax: 305.200.8801

*Counsel for Plaintiff and the Putative Class*